# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| All Star Technical Services, Inc. | ) ASBCA Nos. 58668, 58772 |
| | ) |
| Under Contract No. W9124A-11-C-0002 | ) |

APPEARANCE FOR THE APPELLANT:     Mr. Kevin Ingley
                                                         Senior Vice President

APPEARANCES FOR THE GOVERNMENT:     Raymond M. Saunders, Esq.
                                                         Army Chief Trial Attorney
                                                         Brian E. Bentley, Esq.
                                                         CPT Ahsan Nasar, JA
                                                         Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE THRASHER
## PURSUANT TO RULE 12.3

      This appeal arises out of a contract between the Army and All Star Technical Services, Inc. (All Star) to provide base maintenance support services at Fort Huachuca, Arizona. All Star appeals four claims against the Army and two government claims asserted against it by the Army.[1] All Star elected the Board Rule 12.3 accelerated procedure on 15 July 2013. This decision only addresses entitlement. We have jurisdiction under the Contract Disputes Act (CDA) of 1978, 41 U.S.C. §§ 7101-7109.

## FINDINGS OF FACT

### I. Background

      1. All Star provided base maintenance support services at Fort Huachuca for several years under Contract No. W912A-06-C-0004 (contract 0004). By 2011, contract 0004 was set to end but the government did not have time to compete a follow-on contract without a break in service. As a result, the government decided not to compete the follow-on contract at that time but instead entered into sole source negotiations with All Star to provide bridge services until a new contract could be competed. The

---

[1] ASBCA No. 58668 addresses the four contractor claims appealed from the contracting officer's final decision dated 31 May 2013 and ASBCA No. 58772 addresses the two government claims asserted by the government pursuant to the contracting officer's final decision dated 3 June 2013 (R4, tabs 32, 33).

negotiations are documented, in part, by an email string between All Star's project manager, Mr. Paul Lebeau, the contracting officer's representative, Mr. Nick Lebano, and the contracting officer (CO), Ms. Lynn Warner, between 24 March and 28 June 2011 (app. supp. R4, tab 2). On 24 March 2011 the government asked All Star if it could prepare a proposal for what it would anticipate charging per month for a maximum 12-month bridge contract (*id.* at 7). All Star questioned whether the bridge contract would be a continuation of contract 0004, i.e., continue the hours already on contract, or a new contract, i.e., start with new hours. The government responded that it would be a new contract, "Even though the same type of work will carryover, everything will start over new" (*id.* at 5). All Star responded, "We will need a Schedule B of what we are to bid and a new Section C.5.23 so I know what areas and what hours you want us to price. I can't make the assumption that everything remains the same" (*id.*). The government responded that the CLIN structure would stay the same "as seen on the six month extension and the work will be the same as existing" (*id.* at 4). After All Star again expressed concern about ensuring it had the correct Performance Work Statement (PWS) to prepare its bid, the government responded "DPW would like for All Star to base their proposal for the bridge contract on the existing O&M PWS which I think was last updated by modification in December of 2010; essentially status quo" (*id.* at 3).

2. On 27 May 2011, the US Army Contracting Command issued Contract No. W9124A-11-C-0002 (bridge contract) to All-Star for facility maintenance at Fort Huachuca, Arizona (R4, tab 1). The bridge contract was awarded with an initial base period of seven months (1 June – 31 December 2011) and five one-month option periods. The total period of performance of the contract was not to exceed one-year, ending on 31 May 2012. (R4, tab 1 at KFLD000209) The contract was ultimately extended until 30 November 2012 (R4, tab 22).[2]

3. The bridge contract PWS required the contractor to perform all work designated in five work categories: Service Orders ("SOs"), Preventive Maintenance ("PM"), nonrecurring Individual Job Work Orders("IJOs"), recurring maintenance Work

---

[2] The contract included FAR 52-217-8, OPTION TO EXTEND SERVICES (R4, tab 1 at KFLD000209). On 24 May 2012, the government exercised two months of the FAR 52-217-8 option period via Modification No. (Mod. No.) P00015, which extended the period of performance to 31 July 2012 (R4, tab 16). The period of performance was extended another four times, each for a period of one month: Mod. No. P00016 extended the period of performance by another month to 31 August 2012 (R4, tab 17); Mod. No. P00017 extended the period of performance by another month to 30 September 2012 (R4, tab 18); Mod. No. P00019 extended the period of performance by another month to 31 October 2012 (R4, tab 20); and Mod. No. P00021 extended the period of performance by another month to 30 November 2012 (R4, tab 22).

Orders ("RM"), and Standing Operations Orders ("SOOs").[3] The Directorate of Public Works (DPW) at Fort Huachuca was responsible for planning, directing, supervising and coordinating all facilities engineering activities, including all services required under the bridge contract (R4, tab 1 at KFLD000027). Specific responsibility for project management of the bridge contract, including the issuance of SOs and IJOs, resided in the Chief of the Business Operations and Integration Division of DPW, Ms. Mary Beth Saenz (tr. 62). She worked with the contract administrator, Mr. Lebano, and the CO, Ms. Virginia Jo Miller, to administer the bridge contract (tr. 62, 143).

4. SOs were used to authorize and manage minor maintenance, repair and minor construction jobs that would not exceed $2,000 in total costs or 40 hours in duration (R4, tab 1 at KFLD000030). An IJO was a category of work request used for all maintenance, repair, minor construction, and new work which exceeded the scope of a SO and other similar services, but not covered by a SOO (R4, tab 1 at KFLD000028).

5. The payment and allocation of cost risk between the parties differed between SOs and IJOs. The SO contract price is set at time of award by the contractor's bid based upon the workload estimates provided in the solicitation. The price in the bridge contract (CLIN 003) was negotiated based upon the workload estimates under the previous contract at a fixed price of $669,943.50 per year, paid monthly in payments of $133,988.70. This price was limited up to a maximum number of 17,000 SOs per year (R4, tab 1 at KFLD000003). Therefore, the contractor assumed the risk that the cost of the work ordered within any given month would exceed the negoiated price up to an annual order ceiling of 17,000 SOs. In the event the government required SOs beyond the 17,000 annual ceiling, CLIN 0004 provided additional SOs could be ordered in units of 100 SOs for a fixed unit price of $9,954.00 (id.). IJOs on the other hand, were paid on a fixed-price basis but based upon an estimate and negotiation at the time the requirement arose (id. at KFLD000064 § C.5.1.7.10.1).

## II. Contractor Claims (ASBCA No. 58668)

**Relocation of the 40th Motor Pool**

6. As early as 6 June 2012, a requirement arose for hauling and crane services requiring "1-Crane and Tractor/Flatbed trailer, support from DPW/All Star" for an estimated 3 days, 25/26/27 June 2012, to move the motor pool (app. supp. R4, tab 3 at 1). Both crane support and hauling services are contemplated areas of service in the bridge contract's PWS (R4, tab 1 at KFLD000070 §§ C.5.2.7, C.5.2.8).

---

[3] For purposes of this appeal, appellant's allegations concern the propriety of issuing SOs instead of IJOs and RM for work under the contract. Because All Star does not address PM or SOOs in its appeal, the Board will limit this decision to the issue of SOs, RM, and IJOs.

7. The request to relocate the 40th Motor Pool was originally submitted on 6 June 2012 as IJO # BEA3-33142 with a performance date scheduled for 25, 26, 27 June 2012 (app. supp. R4, tab 3 at 3). The government cancelled that IJO request on 26 June 2012 (*id.*). In its place, the government issued four individual SOs on 26 June 2012, breaking the work into component tasks of crane support separate from flatbed truck support on two separate SOs to be performed on 27 June 2012, and followed up with two more separate SOs to be performed on 28 June 2012 (app. supp. R4, tabs 3-6).

8. Contract section C.5.1.6.1 identifies the requirements and limitations for SOs and the process for requesting the conversion of a SO to an IJO when it exceeds the SO limitations. Specifically, "Any service order exceeding labor and material and limits will be converted to an IJO," and, "Work that is originally assigned as a service order but exceeds the 40-hour limitation on repair work or the $2,000 limitation on new work, will be converted to an IJO. The contractor will be responsible for monitoring service order hours and initiating the IJO request." (R4, tab 1, at KFLD000061 § C.5.1.6.1)

9. The bridge contract grants the government discretion in determining which work will be ordered as a SO or an IJO (R4, tab 1 at KFLD000064 § C.5.7.10.1). However, such discretion is not unlimited. Section C.5.1.6.1 states in relevant part:

> Occasionally there will be a service order requiring more than one trade such as, electrical, plumbing, etc., all tasks will be performed on one service order.... The contractor shall begin work on all service orders within 5 days after materials are received in supply.... Routine maintenance service orders will not exceed 40 hours labor. Prior to reaching 40 hours limitation on routine service orders, the contractor shall be responsible for submitting request for conversion from service order to IJO to the COR for approval. Work that is originally assigned as a service order but exceeds the 40 hour limitation on repair work or the $2,000 limitation on new work, will be converted to an IJO. The COR will have approval authority over all service orders which the contractor proposes for conversion to an IJO.

(R4, tab 1 at KFLD000061)

10. All Star complained immediately to the government, Ms. Kim Taylor, on 26 June 2012 when it learned that the IJO had been cancelled and broken into 4 SOs. Ms. Taylor immediately elevated it to Ms. Miller, the CO, that same day stating:

4

All Star came into my office and initiated a complaint that DPW was breaking our own rule, (incremental work) by breaking up IJO BEA3-33142-...into 6 service orders.... The PM stated that each day's work would total around 32 hours. And the entire job should be on one IJO according to the regulations. DPW management contends we were doing All Star a favor by giving them so many service orders to complete the job. Also stated that there was no way an IJO could be completed before the work needed to be done. All Star requested I take this to the KO for resolution.

(App. supp. R4, tab 3 at 3-4) Ms. Saenz, DPW, testified on direct examination that the government required this task to be performed expeditiously and converting the IJO to multiple SOs avoided the time required for All Star to obtain and submit quotes from its subcontractors (tr. 72-73). Then, on cross-examination, she stated the ordering vehicle was changed to break up the man-hours under each SO to benefit the contractor (tr. 104-05).

11. All Star performed the work under the four SOs on 27 and 28 June 2012, requiring 83.5 man-hours, in excess of the man-hours allowed for SOs (R4, tab 24 at KFLD000977; tab 32 at KFLD001017, ¶ 4). All Star submitted an REA on 25 September 2012 that included claimed costs for relocation of the motor pool in the amount of $2,542.28 (R4, tab 24 at KFLD000977). All Star requested a contracting officer's final decision (COFD) on 02 May 2013 (ex. A-1.) The government issued a COFD denying All Star's claim on 13 May 2013 on the basis that, "Since the contractor never submitted an IJO request to convert the service order to an IJO to the COR, request for equitable adjustment is denied" (R4, tab 32 at KFLD001017, ¶ 4). All Star appealed the COFD to the Board on 17 May 2013 (Bd. corr. ltr. dtd. 17 May 2013).

## DECISION

Appellant argues because relocating the 40th Motor Pool involved both crane and flatbed services, and the tasks are inseparable in the performance of the work, the tasks were required by contract to be combined into a single order. In addition, because the combined hours exceeded the 40-hour service order limit, the order, in accordance with contract requirements, should have been converted to an IJO. (App. br. at 5)

The government, in its post-hearing brief, counters by arguing that the contract vested the government with discretion to determine whether work should be issued as an IJO. In addition, nothing in the contract precludes the government from canceling an IJO and reissuing the work as a SO as long as the work meets the requirements of a SO and, in fact, the government often does so on a daily basis. Finally, the government notes that the PWS contemplates crane services and hauling services as distinct activities. (Gov't

5

br. at 13) Additionally, in its response to appellant's post-hearing brief, the government raises an additional argument for the first time that, "The inaccuracy and length of time to get the estimate back from All Star motivated the conversion of the IJO to SOs, to 'expeditiously accomplish work that we had to do to support our mission' (tr. 102, 135)" (gov't reply br. at 8-9).

The government is correct that the bridge contract grants the government discretion to determine whether work requirements will be ordered as SOs or IJOs and also to change the ordering vehicle (finding 9). However, such discretion is not unfettered. The contract provides direction for determining which mechanism will be used based upon the nature of the work required (findings 8, 9). Here, the requirement was initially ordered as an IJO on 6 June 2012 for work to be performed at the end of the month on 25, 26, 27 June 2012 (finding 7). Oddly, the government does not argue, nor did it present any evidence, that the change was determined by the nature of the work. Instead, it argues the government possessed the discretion to make the change and had to make the change because of insufficient time to process an IJO (gov't br. at 13; finding 10). Ms. Saenz's direct testimony stated the reason the IJO was converted was because the government did not have time to process the IJO. On cross-examination she stated the change was ordered to break up the man-hours under each SO in order to benefit the contractor. Neither stated reason had anything to do with the nature of the work meeting the criteria of a SO under the contract. Perhaps more telling is the email from Ms. Taylor to the contracting office in response to All Star's complaint about the change which stated that DPW management stated the reason for the change was because an IJO could not be processed before the work needed to be done. (Finding 10) The work was ordered as an IJO on 6 June and not cancelled until 26 June, one day before the work was required. No evidence was presented why an IJO could not be processed within this time frame or that appellant caused the delay. Whatever the reason for the delay, we conclude that the government changed the work order because it realized at that point it was too late to issue the work order as an IJO. This was contrary to the provisions of the contract and was an attempt to shift the burden for the government's management of the process to appellant. We therefore sustain ASBCA No. 58668 on this claim.

**New Buildings Added To Bridge Contract**

12. The bridge contract identified the facilities and equipment to be serviced under the contract and included them in Technical Exhibits (TEs) T.5.19.1 and T.5.20.1. Mod. No. P00013, effective 21 March 2012, unilaterally added boiler and HVAC work on 124 pieces of equipment in 8 new buildings to TEs T.5.19.1 and 7 to TEs T.5.20.1 that were not listed at time of award or in contract 0004. (R4, tab 14 at KFLD000821-23) Ms. Saenz testified that the buildings added were new construction that did not exist at time of award and are in excellent condition (tr. 78). She also testified that the addition of the new buildings just changed the location of the work and the nature of the work was no different than that already on contract (tr. 127). Ms. Miller's testimony echoed

Ms. Saenz's, testifying that addition of the new buildings did not add work but just changed the location of the work (tr. 154).

13. All Star submitted a request for equitable adjustment on 25 September 2012 claiming costs incurred as a result of the addition of work under Mod. No. P00013 in the amount of $13,338.51 (R4, tab 24 at KFLD000969). All Star requested a COFD on 02 May 2013 (ex. A-1.) The CO issued a COFD dated 13 May 13 denying All Star's request for equitable adjustment based on her determination that the services fall within the firm fixed-price service order limitations and that All Star did not properly notify the COR when one of the service orders exceeded the service order limitation (R4, tab 32 at KFLD001017, ¶ 5). All Star appealed the COFD to the Board on 17 May 2013 (Bd. corr. ltr. dtd. 17 May 2013).

## DECISION

Appellant's position is that it was only contractually required to perform services on facilities and equipment specifically listed in the TEs of the bridge contract. The government added equipment in 8 buildings to the bridge contract after award by unilateral Mod. No. P00013.[4] Services for these buildings were not anticipated in the contract requirements or appellant's pricing and many service orders were ordered for these buildings under the firm fixed-price that required hundreds of man-hours to perform startup and repair services, resulting in additional costs to the appellant. (App. br. at 21)

The government responds that the contract PWS clearly provided that HVAC and boiler services would be performed under the bridge contract and that Mod. No. P00013 was issued to identify the buildings in Areas 1 and 8 that required HVAC and boiler services. Moreover, the additional work did not increase the total number of SOs above the contract limit of 17,000 and none of the work performed in Areas 1 and 8 was different in nature, duration or difficulty than the work performed under other SOs. The crux of the government's position is that the additional HVAC and boiler services resulting from the addition of new buildings was within the scope of the contract and the resulting additional SOs were within the 17,000 limit. As a result, All Star is not entitled to additional compensation for this work. (Gov't br. at 14)

We are not persuaded by the government's position. The buildings added to the bridge contract were not anticipated within the contract requirements or appellant's pricing at time of award. The government does not dispute the buildings added by P00013 were not listed in the bridge contract or contract 0004. In fact, the government's own witness testified all the buildings added were new construction after award of the bridge contract (finding 12). We understand the government's position to be that the

---

[4] Appellant initially indicated there were 15 buildings added but later corrected this assertion in its reply brief (app. reply br. at 2).

addition of the new buildings was a no-cost change because the HVAC and boiler services on the added buildings did not differ from similar work ordered by SOs on other buildings, the buildings were new in good condition and would not exceed the SO ceiling of 17,000 per year.

What the government's position ignores, is the fact SOs are fixed-priced and the price is established at time of award. Appellant is only obligated to perform SOs on facilities designated within the contract and accordingly prices its bid for SO work on an estimate of the number of SOs it will perform (finding 5). The buildings in question could not have been part of that equation. Therefore, appellant is entitled to compensation for work performed by SOs added by this change. Accordingly, we sustain ASBCA No. 58668 on this claim.

**Pop-Up Barriers**

14. All Star installed pop-up security barriers at two of the gates to the installation in 2007 under contract 0004 (tr. 1/35-37, 80). These barriers are metal barriers embedded in the ground and are designed to stop unauthorized vehicles from entering the installation by popping up out of the ground when triggered and require recurring maintenance to ensure they are functional. Mr. Ingley testified that contract 0004 and the bridge contract contained specific lists of facilities and equipment in the TEs that were to be serviced under the contract but was not modified to reference pop-up barriers. Additionally, neither the pricing on the contract 0004 nor All Star's proposal on the bridge contract was adjusted to reflect the addition of the pop-up barriers. Instead, the government ordered maintenance for the pop-up barrier work by IJOs under the previous contract 0004 but after award of the bridge contract began ordering the work under SOs. (Tr. 35-37) The government did not present any evidence to directly rebut this testimony but instead called two witnesses who asserted that, in their opinions, such maintenance was covered under general provisions of the bridge contract.

15. Ms. Saenz's testified she believes the pop-up barriers are part of the street and therefore included under the bridge contract within C.5.2.5 Traffic Services (tr. 81-82). Section C.5.2.5 which provides in pertinent part that the contractor shall reroute traffic IAW Subsection C.5.2.5.2 Barricades and Lighting Devices, which requires in pertinent part that, "The contractor shall install, replace, remove, and inspect permanent and mobile barricades (types I, II, III) cones, drums, vertical panels, and lighting devices, which warn drivers of hazards created by construction, maintenance, and storm damage in or near traveled way, and which guide and direct drivers safely past the hazards." (R4, tab 1 at KFLD000069) Types I, II, and III barriers are mobile barriers which do not include the pop-up barriers (tr. 110-11). We find that the pop-up barriers are not addressed within the coverage of section C.5.2.5 or C.2.5.2.

8

16. In addition, Ms. Saenz considered the pop-up barriers to be surfaced areas under the contract because they are safety barriers that are physically embedded into the road and are treated as part of the road. Consequently, maintenance on the pop-up barriers would fall within the contract definition of maintenance which applies to surface areas, including roads. Contract section C. 2 DEFINITIONS/ACRONYMS, defines maintenance as:

> Maintenance (applies to surfaced areas): Maintenance of roads, airfields, and other surfaced areas primarily encompasses day-to-day routine work. It includes such functions as blading or dragging stabilized surfaces (see definition below); cleaning ditches; patching; sealing existing paved surfaces; sealing joints and cracks; slabjacking; snow removal; snow fence erection and removal; vegetation control near pavements; erosion control; maintenance of bridges, trestles, retaining walls, culverts, inlets, and manholes; and replacing or repainting pavement markings and traffic control signs and signals. Examples of other applicable work are: 1) application a dust palliative (i.e., a chemical, dilute asphalt emulsion, or single surface treatment) both to the trafficway and the road shoulder, provided only minimal surface preparation is needed; 2) application of a sealer coat or surface treatment on existing asphaltic concrete surface; and 3) scarifying a stabilized area, adding new material, reshaping, and compacting.

(Tr. 84-85; R4, tab 1 at KFLD000040) We find the pop-up barriers are not addressed within definition of maintenance under section C.2.

17. Ms. Miller, the CO, testified she considered the pop-up barriers to be a security device as well as a traffic device under section C.5.2.5.2, explaining it could possibly be used to redirect traffic. In addition, she also considered them to be included under the provisions of Department of Army Pamphlet 420-11, Project Definition and Work Classification, section which defines surface areas to include safety barriers[5]. (Tr. 170-75; ex. G-3 at 6) We find that the provisions of Army Pamphlet 420-11 do not apply to the pop-up barriers.

18. The contract, at section C.5.16.8.2, provided that All Star "shall repair, maintain, install, and test the systems and all components listed [in section]

---

[5] Army Pamphlet 420-11 indicates "safety barriers" are included in the definition of "Surfaced areas." (Ex. G-3 at 6, § (k)(3))

9

C.5.16.8.2.1." This section lists the components included within its coverage which are all electrical related components. (R4, tab 1 at KFLD000148) Contract section C.5.16.8.2.1 Miscellaneous Control Systems Equipment identifies traffic control systems as a category of equipment, indicating eight (8) pieces of this equipment are installed on the installation (*id.*). We find that the pop-up barriers are not a system or component under sections C.5.16.8.2 or C.5.16.8.2.1.

19. All Star submitted a REA on 25 September 2012 in the amount of $41,812.43 and requested a COFD on 2 May 2013 (R4, tab 24; ex. A-1). The CO issued a COFD dated 13 May 2013 denying the REA on the stated basis that the services fall within the firm fixed-price SO limitations and that All Star did not properly notify the COR when one of the service orders exceeded the service order limitation (R4, tab 32 at KFLD001016, ¶ 1). All Star appealed the COFD to the Board on 17 May 2013 (Bd. corr. ltr. dtd. 17 May 2013).

## DECISION

Appellant argues the pop-up barriers were never added to the contract 0004 or the bridge contract technical exhibits. Appellant performed work on the barriers and was reimbursed by IJOs under the contract 0004. When asked to submit a proposal for performing the bridge contract, appellant was told to base its price on the then existing PWS and that it should assume the status quo. As a result, appellant did not adjust the pricing for the fixed priced SOs in the bridge contract because it relied upon the government's representations, assuming barrier maintenance would be accomplished using IJOs. Thus, we understand appellant's position to be that the government's action in using SOs to order this work constituted a constructive change to the contract, entitling appellant to an equitable adjustment. (App. br. at 32)

The government counters by arguing appellant is not entitled to an equitable adjustment because the pop-up barriers are addressed within the PWS under traffic services and maintenance of surfaced areas, appellant was aware of the this requirement under the bridge contract because it performed the work under contract 0004 and the work under the bridge contract was properly ordered as SOs (gov't br. at 16-18).

We reject the government's position; our findings establish the barriers were not contemplated by contract 0004 provisions or the bridge contract. Likewise, barrier maintenance was not added to a contract 0004 technical exhibit as equipment to be maintained when the barriers were installed. (Finding 14-18) In fact, there is no evidence the barriers were ever formally added to the contract during performance of the bridge contract. It is undisputed both parties were aware of the barriers and the use of IJOs to reimburse this recurring maintenance under the previous contract. The government, during negotiation of the bridge contract in response to questions from appellant, represented that appellant's proposal should rely upon the existing PWS and

10

assume the "status quo" (finding 1). Appellant relied upon this representation and priced its proposal assuming this work would be accomplished using IJOs not fixed priced SOs (finding 14). Therefore, we conclude the government's change to the use of SOs for this work is a constructive change to the contract. As a result, we sustain ASBCA No. 58668 on this claim.

**Landscaping and Herbicide Recurring Maintenance**

20. Both contract 0004 and the bridge contract required All Star to conduct various ground maintenance to include, but not limited to, weed control and landscaping (R4, tab 2 at KFLD000403 §§ C.5.3.). Additionally, both contracts provided guidance on applying pesticides and herbicides (R4, tab 1 at KFLD000092, § C.5.6.3.6.1). This work was accomplished as recurring maintenance (RM) under the previous contract but Mod. No. P00067 of that contract, dated 4 February 2010, substantially reduced funding and hours for landscape, herbicide, and pesticide RM work.[6] In addition, Mod. No. P00067 stated "The Government retains the right to obtain these services under a service order and/or by issuance of an individual job order" (app. supp. R4, tab 7 at 2). Thereafter, the government ordered this work using IJOs (tr. 37).

21. All Star's Project Manager. Mr. Lebeau, specifically asked about section C.5.23 (workload data including landscape and herbicide work) during negotiation of the bridge contract, "so [Appellant would] know what areas and what hours you want us to price. I can't make the assumption that everything remains the same" to which the government replied, "the bridge (contract) will maintain the same CLIN structure as seen on the six month extension (contract 0004) and the work will be the same as the existing." (App. supp. R4, tab 2 at 4-5) After the government responded only confirming the CLIN structure would be the same, Mr. Lebeau followed up stating, "I understand the no change in the CLIN structure. I just want to be sure that we are both working off the same section C.5.23 hours…. Just want to be sure we are all on the same page" (id. at 4). The government replied that All Star was "to base their proposal for the bridge contract on the existing O&M PWS (Operations and Maintenance contract 0004, Performance Work Statement)…essentially status quo." (Id. at 3)

22. The bridge contract was awarded with higher RM hours for herbicide (697.7) and landscape (1,820) than those in contract 0004 PWS used for All Star's proposal (R4, tab 1 at KFLD000194-95, § C.5.23.3). After reviewing the awarded bridge contract, Mr. Lebeau noticed the hours include in section C.5.23 included hours that were not considered in All Star's proposal, including hours for landscaping maintenance and herbicide (app. supp. R4, tab 2 at 2). Mr. Lebeau notified the CO about this and she

---

[6] Mod. No. P00067 reduced landscaping hours by 4,621 hours to a new total of 1116 and herbicide and pesticide hours by 2,774.3 hours to a new total of 345.7 (app. supp. R4, tab 7 at 2).

11

replied, "we will have to review the PWS and make sure we didn't use the wrong one :( Rushing to get something done always creates unexpected issues...we will fix as soon as possible" (*id.*). On 28 June 2011, Mr. Lebano emailed Mr. Lebeau that he would correct the C.5.23 hours in accordance with the PWS upon which All Star based its proposal and the figures acknowledged in the previous email which would be reflected in an upcoming modification to the bridge contract. *(Id.)* However, on 10 August 2011, Mod. No. P00001 removed all RM hours for herbicide and landscape work from the bridge contract rather than just lowering them to the previous levels under contract 0004 (R4, tab 2 at KFLD000515-16). Although Mod. No. P00001 removed all hours for RM, it retained non-recurring work stating that the contractor could expect on average per calendar month approximately 45 SOs for landscaping (C.5.3.) at 5.67 man-hours each and approximately 114 SOs at .72 man-hours each for herbicide (C.5.6) (R4, tab 2 at KFLD000514, § C.5.23.1).

23. Mr. Ingley testified that the government removed all landscaping and herbicide RM from contract 0004 and then used IJOs to address landscaping and herbicide work but then, after All Star submitted its proposal based upon contract 0004, changed to the use of SOs under the bridge contract (tr. 37-38). On cross-examination, Mr. Ingley conceded that he had only been to the worksite at Fort Huachuca about once a year over a four-year period (tr. 39-40). The government's evidence primarily consisted of the testimony of Ms. Saenz. Ms. Saenz testified that the government used IJOs to order routine maintenance under contract 0004 when funds were available but after award of the bridge contract eliminated routine maintenance because of a lack of funds and then only issued SOs to address safety and special events (tr. 85-86).

24. All Star submitted a REA on 25 September 2012 for landscaping and herbicide work in the amount of $29,211.40. Attachment 1 of the REA was a list of landscaping and herbicide orders between August 2011 and July 2012. (R4, tab 24) All Star requested a COFD on 2 May 2013 (ex. A-1.) The CO issued a COFD, dated 13 May 2013, denying the request for an equitable adjustment stating that issuance of SOs for this work was authorized under the contract and each SO issued met the requirements for a SO (R4, tab 32 at KFLD001016-17, ¶¶ 2, 3). All Star appealed the COFD to the Board on 17 May 2013 (Bd. corr. ltr. dtd. 17 May 2013).

## DECISION

Appellant argues the government terminated the recurring maintenance program for herbicide or landscaping under contract 0004, with a commensurate reduction in price, and thereafter ordered any needed herbicide and landscaping work on an "as needed" basis by IJOs. During negotiation of the bridge contract, the government instructed appellant to base its proposal on contract 0004 PWS. Relying upon the government's representations, appellant did not add (price) additional SO herbicide or

12

landscaping hours, believing such work would be performed by IJOs as done under contract 0004. However, shortly after award of the bridge contract, the government eliminated all recurring maintenance for herbicide and landscaping work on the post causing ground conditions to deteriorate to the point where overgrowth created a safety hazard requiring issuance of work orders to address the safety issues. However, unlike under contract 0004, the government ordered this work as fixed-price SOs rather than IJOs. This, appellant argues, shifted the cost of addressing the consequences of the government's decision to stop recurring maintenance from the government to appellant, entitling appellant to an equitable adjustment. (App. br. at 32-34)

The government counters that it eliminated all RM for landscaping under the bridge contract, due to a lack of funding, and the only orders placed under the bridge contract for herbicide and landscaping were to address non-recurring safety problems or special events. Also, the government argues that the use of SOs to accomplish such work was appropriate because the bridge contract contains SO hours for this type of work as under contract 0004, putting appellant on notice such work might be ordered and should be priced. (Gov't br. at 18-19; gov't reply br. at 13-14)

Our findings establish the previous contract substantially reduced, but did not eliminate, landscaping and herbicide RM and the work that remained was ordered as an IJO. Appellant based its proposal on the contract 0004 PWS and the existing PWS carried over to the bridge contract. After award of the bridge contract, the government eliminated recurring landscape and herbicide maintenance under the contract by eliminating the hours for such work. (Finding 22) However, the government continued to require non-recurring landscaping and herbicide work for special events and safety purposes, which the government chose to order as SOs (finding 23).

We understand appellant's argument to be that the government, as a practical matter, continued to require landscaping and herbicide RM even though technically it was removed from the contract. As a result, because the government ordered such work by SOs, it shifted the cost for this work from the government to appellant and changed the parties' understanding under the contract resulting from the representations made by the government during negotiations. We reject appellant's argument for lack of a factual basis. Appellant failed to prove the government was in fact ordering RM landscaping and herbicide work. Mr. Ingley's testimony characterized the ordered work as RM landscaping and herbicide work. However, the record reflects Mr. Ingely lacked personal knowledge to support his testimony since he was not at the work site on a regular basis (finding 23). The government presented proof, through testimony, that the landscaping

13

and herbicide work ordered was only to address non-recurring safety issues[7] and special events, not routine maintenance (*id.*). Our review of attachment 1 of appellant's REA does not, on its face, affirmatively support appellant's argument or contradict the government's position. Consequently, we find the government's proof on this issue more persuasive and therefore, deny ASBCA No. 58668 on this claim.

### III. Government Claims (ASBCA No. 58772)

**Damage to Bucket Truck**

25. On 13 July 2012, All Star employee Mr. George Jones, a Heavy Equipment Operator, struck a high voltage line with the boom of a government-furnished bucket truck after setting the bucket truck on a dirt berm beside an electrical pole. After attempting to reach the pole, Mr. Jones raised the boom and contacted the high voltage wire. The incident created an hour-long power outage and rendered the vehicle inoperable. (Gov't. supp. R4, tab 1)

26. On 27 July 2012, All Star's Project Manager, Paul Lebeau, forwarded a memorandum to the CO with All Star's safety report of this incident attached. The memorandum mirrored the findings of the report, in pertinent part stating:

> [A]fter a thorough investigation, we have determined that the operator failed to follow appropriate safety regulations and showed lack of sound judgment when he set up the bucket truck under energized power lines. As serious as this accident was, we do not feel the operator was negligent in that he was trying to find a work-around area to set up the bucket truck in order to complete his assigned task. He also did not show deliberate inattention to the fact that the energized power lines were present in the area. He felt that he could safely set up the bucket truck and accomplish the task without putting himself or others in harm's way or causing damage to the truck or the installations electrical lines and/or systems....

(*Id.*)

---

[7] Ms. Saenz provided an example of a safety issue that required this work on a non-recurring basis. She explained that All Star personnel are required to provide services at various locations on the facility and rattlesnakes, which are big problem on the facility, pose a safety issue for any personnel working in areas with knee high grass (tr. 128/129).

14

27. The contract distinguishes between two types of government-furnished equipment (GFE), each with differing allocation of risks between the parties in the event the contractor damages the GFE. Section C.3.4.1, General Service Administration (GSA) Vehicles, states in relevant part: "The Government will furnish GSA vehicles such as utility trucks, dump trucks, pickup trucks, four wheel drive vehicles, etc. for use on the contract. A core listing of vehicle types and numbers which the Government will furnish is shown at TE 3.2." The section continues with "Any damage deemed to be caused by contractor negligence will be repaired by the contractor...." (R4, tab 1 at KFLD000051-52) In contrast, section C.3.4.2, Engineer Type Vehicles, states in relevant part, "The Government will furnish limited quantities of engineer-type equipment such as dozers, cranes, sanitary trucks, road sweepers, etc. listed in TE 3.3...." The section continues, "The Contractor shall follow repair procedures identified at paragraph C.3.4.3." Section C.3.4.3 states in relevant part:

> The contractor shall prepare a DA 3161 and provide to the COR requesting approval for any needed repairs of GFE. The DA 3161 shall include the cost of repair along with the replacement cost to allow the COR to make a determination as to whether or not it is cost effective for the Government to repair the equipment. Maintenance and repair of GFE will be at no cost to the contractor....

(R4, tab 1 at KFLD000052)

28. The bucket truck at issue is listed under TE 3.3 as a 1996 Navistar International Truck, NSN #2320-01-T08-8450 with an administrative number of E-111 (gov't supp. R4, tab 8 at T-3-3-5)[8] As a result, we find that the provisions of Section C.3.4.2 and the risk allocation provisions of C.3.4.3 apply to this dispute.

29. The contract also incorporates by reference FAR 52.245-1, Government Property (Aug 2010). Paragraph (h)(1) of that clause states in relevant part:

> (h) Contractor Liability for Government Property.

---

[8] All Star's safety investigation report and cover memorandum identify the bucket truck as E-111 (gov't supp. R4, tab 1). Government internal documents and email to the government regarding an inspection of the truck by a third party, American Inspection and Test, Inc. identify it as E-110 (*id.* at 7-10). The COFD (demand for payment) identifies the truck as E-111 (R4, tab 33). This apparent discrepancy has no bearing on this dispute because both E-110 and E-111 are found on the TE 3.3 GFE list and identified as 1996 Navistar International Trucks (gov't supp. R4, tab 8 at T-3-3-5).

15

(1) Unless otherwise provided for in the contract, the Contractor shall not be liable for loss, theft, damage or destruction to the Government property furnished or acquired under this contract, except when any one of the following applies....

....

(ii) The theft, damage or destruction is the result of willfull misconduct or lack of good faith on the part of the Contractor's managerial personnel.

(R4, tab 1 at KFLD000229)

30. The contract also included H-16, 52.200-4045 I-SAFETY (Fort Huachuca Special Provision) which provided in relevant part, "The Contractor shall be responsible for all damages to persons and/or property that occur as a result of contractor negligence in connection with work requirements contained in contracts" (R4, tab 1 at KFLD000224).

31. On 3 June 2013 the government issued a demand for payment to All Star for the cost to repair the damage to the bucket truck in the amount of $71,021.29 stating, "The contract section C.3.4.1 states that any damage deemed to be caused by contractor negligence will be repaired by the contractor at no cost to the Government..." (R4, tab 33). Ms. Miller testified that her decision to make the demand for payment for the damage to the bucket truck was based upon her conclusion from her review of the safety report, from which she concluded, "proper procedures were not followed by All Star personnel, and they were responsible for the damage to the truck" (tr. 156-57). Although not referenced in her demand letter, she also testified that All Star's liability for the damage was based upon the contract clause H-16 and on cross-examination that her determination that proper procedures were not followed was based upon the fact there was no ground spotter at the site (tr.157, 178). All Star appealed the COFD to the Board on 15 July 2013 (Bd. corr. ltr. dtd. 15 July 2013).

## DECISION

The government property clause, FAR 52.245-1, states in part "Unless otherwise provided for in the contract, the Contractor shall not be liable for loss, theft, damage or destruction to the Government property furnished or acquired under this contract" (finding 29). However, the parties identify two other contract clauses that allegedly control under these facts and would be consistent with the government property clause.

16

The government argues appellant is liable to the government for damages to bucket truck because of the negligence of its employee, specifically for failing to follow safety procedures by not having a ground spotter on the job, pursuant to the provisions of Fort Huachuca Special Provision H-16, 52.200-4045 I and appellant's own report of the accident evidences such negligence (gov't br. at 20). Fort Huachuca Special Provision H-16, 52.200-4045 I states in pertinent part, "the Contractor shall be responsible for all damages to person and/or property that occur as a result of contractor negligence in connection with work requirements contained in contracts" (finding 30).

Appellant argues that its employee was not negligent because there was a spotter on the job and the provisions of contract section C.3.4.3 determine any liability for damage to the truck rather than special provision 52.200-4045 I (app. br. at 50-51). Our findings establish that the damage to the truck is controlled by the risk allocation provisions of section C.3.4.3 which state that, "[M]aintenance and repair of GFE will be at no cost to the contractor..." (finding 28).

Our task is one of contract interpretation to identify which contract provision controls. Special provision 52.200-4045 I is a general safety clause covering damage to any person or property under the contract while section C.3.4.3 is directed specifically to the property in question. Where, as here, there are general and specific provisions which are in any respect inconsistent or conflicting, the provision directed to a particular matter controls over the provision which is general in its terms. *Hol-Gar Manufacturing Corp. v. United States*, 169 Ct. Cl. 384, 396, 351 F.2d 972 (1965). Since the bucket truck involved was listed in TE 3.3, and section C.3.4.2. specifically instructs the contractor to follow the repair procedures at C.3.4.3., we conclude the provisions of C.3.4.3 apply to this dispute and appellant is not liable for the damage to the bucket truck, even if negligence were proven. As a result, appellant's appeal in ASBCA No. 58772 is sustained as to this government claim.

**Missing Inventory**

32. On 3 June 2013 the government issued a demand for payment to All Star. That letter stated, "A final inventory inspection was conducted on Government Furnished Property and Equipment (GFE) and 33 items are missing (Attachment A, Inventory of Missing GFE). The items were valued at a cost of $5,380.27." (R4, tab 33 at KFLD001023, ¶ 3) All Star appealed the COFD to the Board on 15 July 2013 (Bd. corr. ltr. dtd. 15 July 2013). Based upon the evidence and testimony elicited at the hearing, the government withdrew its opposition to this appeal (gov't br. at 2, n1). Accordingly, appellant's appeal on this claim in ASBCA No. 58772 is sustained.

17

## CONCLUSION

These appeals are sustained in part and denied in part as reflected above. The sustained appeals are remanded to the parties for determination of quantum.

Dated: 7 January 2014

JOHN J. THRASHER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

PETER D. TING
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58668, 58772, Appeals of All Star Technical Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

18